IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:17-cr-00087-002-JO |
| | ) | |
| v. | ) | |
| | ) | |
| CELSO MARROQUIN-BENITEZ, | ) | OPINION AND ORDER |
| | ) | |
| | ) | |
| Defendant. | ) | |

JONES, J.

Defendant Celso Marroquin-Benitez pleaded guilty to conspiracy to distribute and possess with intent to distribute more than 500 grams of methamphetamine, an offense that carried a ten-year mandatory minimum sentence. ECF No. 116. In 2018, Judge Anna Brown of this court sentenced Defendant to 168 months' imprisonment, which was the low end of the advisory guideline range. ECF Nos. 153, 157.

Defendant now moves to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, claiming that his attorney, Gary Bertoni, had an actual conflict of interest; that Bertoni provided ineffective assistance of counsel during plea negotiations and sentencing; and that these cumulative errors violated Defendant's due process rights. Def.'s Mot., ECF No. 162 (filed by Defendant *pro se*); Def.'s Am. Mot., ECF No. 187 (filed by appointed counsel). For the following reasons, I deny Defendant's § 2255 Motions.

1 -- OPINION AND ORDER

# I. BACKGROUND

## A. Defendant's Criminal Conduct

From late December 2016 through mid-February 2017, a confidential informant worked with Multnomah County Sheriff's Office investigators making controlled buys of methamphetamine and heroin from a supplier later identified as co-defendant Alfredo Narcisco Pineda. Presentence Investigation Report (PSR) ¶¶ 14-20. In mid-February 2016, investigators directed the informant to purchase methamphetamine from Pineda. While investigators listened on a speaker phone, Pineda told the informant he was out of heroin and methamphetamine, but was waiting for a delivery and would call the informant as soon as he received the drugs. Investigators sent deputies to surveil Pineda's residence, where they saw a brown Chevrolet sedan stop briefly and leave. Soon after the Chevrolet left, Pineda notified the informant that he now had the drugs. The informant drove to Pineda's residence and purchased methamphetamine there. Investigators inferred that the person driving the Chevrolet had supplied Pineda with drugs.

A records check showed that the registered owner of the Chevrolet was co-defendant Alejandro Lopez-Gonzalez. Officers followed Lopez-Gonzales as he drove from Pineda's residence until he stopped at an apartment in Gresham. There, Defendant got into the Chevrolet. The two men soon switched vehicles to drive away in a white Toyota Tacoma. The officers followed the Toyota to a sporting goods store. While waiting in the store parking lot, the officers watched a store employee load a large box into the Toyota. After Defendant and Lopez-Gonzalez drove away from the store, the officers pulled over the Toyota for a traffic violation. During the traffic stop, the officers identified Defendant, age 40, as the driver and Lopez-Gonzalez, age 24, as the passenger, and saw that the box from the store contained a large safe.

After issuing a warning, the officers allowed the two men to drive away. Meanwhile, other investigators followed the Toyota back to the Gresham apartment. Utility records for the Gresham apartment were in Lopez-Gonzalez's name.

On February 15, 2017, the investigators obtained search warrants for Pineda's residence and the Gresham apartment. The investigators believed that Lopez-Gonzalez and Defendant were supplying drugs to Pineda, using the apartment in Gresham to store drugs, and purchased the safe for their drug trafficking operation.

On February 22, 2017, deputies executed the search warrant for the Gresham apartment. While deputies were inside the apartment, Defendant and Lopez-Gonzalez arrived, noticed the front door was ajar, and tried to run away. They did not get far before being arrested.

At various locations in the Gresham apartment, deputies seized about $14,800 in U.S. currency, digital scales and packaging materials for selling drugs, and precursor chemicals and containers for making crystal methamphetamine. During a search incident to arrest of Lopez-Gonzalez, deputies obtained a key to a small safe in the apartment. In the small safe, deputies found about a pound of heroin and a key to the large safe that deputies had observed in the Toyota Tacoma. Inside the large safe, deputies found 90 pounds of methamphetamine, or about 40 kilograms, divided into 42 bags. PSR ¶ 23. According to the government, this was the largest quantity of methamphetamine seized in Oregon up to that time. Gov't Resp. 1. As the government notes, 4.5 kilograms of methamphetamine is the threshold amount to reach highest base offense level for methamphetamine, 38.

While searching the Gresham apartment, deputies learned that Defendant was living in southeast Portland. Deputies drove to Defendant's residence and talked to a woman there, Lorena Pacheco-Cabrera. Deputies noticed that Pacheco-Cabrera repeatedly tried to

communicate by phone with Defendant, who was now in custody. Pacheco-Cabrera said she was the mother of Defendant's two children, who also lived there. In Defendant's residence, deputies found keys to the Gresham apartment and to the large safe that contained the 90 pounds of methamphetamine.

### B. Plea Negotiations

On March 14, 2017, a federal grand jury issued an indictment charging Defendant and Lopez-Gonzalez with conspiracy to distribute and possess with intent to distribute controlled substances; possession with intent to distribute more than 500 grams of methamphetamine; and possession with intent to distribute more than 100 grams of heroin. The remaining three counts charged Pineda with drug distribution and being a felon in possession of a firearm.

On March 23, 2017, Defendant made his initial appearance and was detained based on flight risk and danger. This court appointed Criminal Justice Act panel attorney Kendra Matthews to represent Defendant.

In April 2017, the government gave Defendant an early resolution offer, which was to expire at the first trial setting. On April 3, 2017, the government emailed Matthews a factual summary of the case, describing the case as relatively simple, the result of "a couple of months of good old fashioned police work, by good investigators, leading to a record-setting seizure of meth." Gov't Ex. 2, at 2 (April 3, 2017 email from AUSA Leah Bolstad to Matthews). Bolstad noted that Defendant "is looking at very high exposure, a mandatory minimum of 10 yrs, and so there's much to be gained by sitting down for a confidential proffer." *Id.*

On April 14, 2017, the government emailed Matthews, offering a 1-level reduction for early resolution if Defendant reached a plea agreement before the first trial setting. The

government noted Defendant's likely advisory guideline range of 168-210 months, which could be lowered to 151-188 months with a reduction for early acceptance.  Gov't Ex. 2, at 1.

A few days later, Bolstad met with Matthews to discuss a plea agreement.  On April 21, 2017, after their meeting, Bolstad emailed Matthews, clarifying that the government would offer Defendant a 2-level reduction for early resolution "if he contacts the court before May 23 to set a plea date."  Gov't Ex. 2, at 1.  Bolstad stated that if Defendant was in criminal history category I, with reductions for acceptance of responsibility and early acceptance, his guideline range would be 135-168 months.  *Id.*

On May 15, 2017, Matthews emailed Bolstad, stating that Defendant "is still reflecting on the current offer/the reality of 10+ years imprisonment.  I need to get a motion to continue filed in the meantime.  I will obviously let you know / let the court know if he decides to accept the plea before May 23rd."  Gov't Ex. 4, at 4.  The government did not object to the requested 90-day continuance.

On May 18, 2017, Matthews emailed Bolstad, stating, "My client has given me permission to tell you that he is willing to resolve the case on the terms detailed below."  Gov't Ex. 4, at 3.  On June 22, 2017, Matthews emailed Bolstad, stating that Defendant "has agreed to the 'early resolution' offer."  Gov't Ex. 4, at 2.  On June 23, 2017, Bolstad responded that she had received notice of Defendant's acceptance of the plea offer.  Gov't Ex. 4, at 2.  Bolstad attached a plea agreement letter, backdated to April 21, 2017.  Under that offer, Defendant would plead guilty to conspiracy to distribute a controlled substance as alleged in count 1 of the indictment.  Bertoni Decl. ¶ 16.  The offer noted that if Defendant was in criminal history category I, qualified for acceptance of responsibility and early acceptance, and received a

"safety-valve" reduction[1], the range could be lowered to 108-135 months, although Defendant would agree not to seek a sentence below the 120-month mandatory minimum.

In August 2017, Defendant changed his mind and decided to reject the government's plea offer. On September 14, 2017, Matthews emailed Bertoni to explain the status of the case after Defendant retained Bertoni to replace her as counsel. Regarding Defendant's change of heart on the plea offer, Matthews stated that Defendant "advised me that while he thought I was very smart and trustworthy[,] because I worked for the government I could not be trusted to give him sound advice and since that [plea] offer was so terrible there was clearly something up." Gov't Ex. 3, at 1. Matthews stated that Defendant also told her "that his family did not want me to be his attorney even if it meant losing the deal. (For the same reason: not trustworthy because I was paid by government.)" *Id.*

In the email to Bertoni, Matthews described her discussions with Defendant about the case:

> We spent HOURS in many, many, meetings discussing the facts, law, motions to suppress, trial, the nature of conspiracy in a drug case, the nature of physical possession, the nature of Leah Bolstad and how she would sound in a trial, and how likely it was that [Defendant] could testify in a way that would exclude him from a conspiracy conviction, and the reality that, once rejected, the - 2 levels for early resolution would be likely gone forever. We discussed these items for hours before he authorized me at MCIJ [Multnomah County Inverness Jail] to tell Leah we would take the offer in May, and hours going over the same subjects at Sheridan [Federal Correctional Institution (FCI)] in July and August when he advised me that he changed his mind.

---

[1] "The safety-valve provision allows a district court to sentence a criminal defendant below the mandatory-minimum sentence for particular drug offenses." *United States v. Lopez*, 998 F.3d 431, 435 (9th Cir. 2021). To qualify for safety valve relief from a mandatory minimum sentence, a defendant must satisfy 18 U.S.C. § 3553(f)'s conditions. Here, Defendant was unable to satisfy the proffer requirement in subsection (5), which requires that "not later than the time of the sentencing hearing the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement."

Gov't Ex. 3, at 1.  Matthews's "speculation" was that Defendant's "cold feet" about the plea

offer was somehow linked to his transfer to Sheridan, although neither she nor Bertoni

understood why Defendant decided to reject the plea agreement.  *Id.*

Defendant, who had been in custody since his arrest, sought a consultation with Bertoni.

Bertoni Dec. ¶ 9, Gov't Am. Ex. 1.  During their first meeting at Columbia County Jail on

August 12, 2017, Bertoni learned that although he had been informed that Defendant understood

spoken English, in fact his "English skills were limited." *Id.*  Bertoni and Defendant agreed to

meet again with an interpreter.  For the second meeting, Bertoni brought Eidar Gonzalez, who

worked with him as an interpreter and investigator.  Gonzalez translated for Bertoni during most

of his meetings with Defendant.  If Gonzalez was not available, Bertoni used a translation

application on his phone to communicate with Defendant.

When Bertoni and Gonzalez met with Defendant at Sheridan FCI on August 23, 2017,

Bertoni discussed the terms of his engagement.  Bertoni Dec. ¶ 10.  With Gonzalez translating,

Bertoni explained the flat fee agreement, including the amount of the basic flat fee ($12,500), the

event flat fees (an additional $7,500 for representation at trial), and the possibility of a full or

partial refund of the flat fee if Defendant terminated Bertoni's services, depending on how much

work Bertoni had completed when he was terminated.  Def.'s Ex. 8 (engagement letter in English

and Spanish, signed by Defendant).  Bertoni states that Defendant "indicated he understood the

terms of the proposed flat fee agreement and agreed to engage [his] services." Bertoni Decl. ¶

10.

On August 25, 2017, after Gonzalez had reviewed the Spanish translation of the flat fee

agreement, Bertoni met with Defendant and brought a copy of the agreement in Spanish.

Although he was unable on short notice to have Gonzalez present to translate, Bertoni used his

"Speak and Translate" phone application because the meeting would be brief.  Bertoni Decl. ¶ 13.

On September 8, 2017, Matthews emailed Bertoni that Defendant "had called her and told her he had retained [Bertoni] and verbally authorized her to release his file" to Bertoni. Bertoni Decl. ¶ 14.  Bertoni states, "I was told [Matthews] quizzed him on his decision to hire new counsel to insure he knew what he was doing."  *Id.*  On September 11, 2017, Matthews filed a declaration in support of Defendant's Motion to Substitute Attorney.  ECF No. 68.

On September 15, 2017, Defendant appeared with Bertoni for a hearing before Judge Brown on Defendant's Motion to Substitute Attorney.  ECF No. 66.  Judge Brown granted the motion after confirming with Defendant that he had consulted Matthews about the substitution of Bertoni as his attorney, and that he wanted to hire Bertoni.  Bertoni Decl. ¶ 19.

On September 18, 2017, Bertoni and Gonzalez met with Defendant at Columbia County Jail to review the signed agreement.  Bertoni states that Defendant "confirmed he understood the contract and that the terms of employment were acceptable."  Bertoni Decl. ¶ 21.  Bertoni states that he discussed why Defendant had initially accepted the government's plea offer and then rejected it.  *Id.*  According to Bertoni, "I told him at that time that I could not guarantee that I will get a better plea offer and that the only way he could reduce his sentence was by cooperating with the government and/or if safety valve eligible.  He indicated he understood and that is what Ms. Matthews told him."  *Id.*  According to Bertoni, Defendant "indicated on August 23 and September 18, 2017, that he understood what he signed [the fee agreement] and agreed to all the terms."  *Id.* at ¶ 12.  Defendant now states he "did not fully understand the engagement letter" because he does not read or write well.  Benitez Dec. ¶ 3, Def.'s Ex. 3.

Bertoni states that he informed Defendant that a criminal tax case against him was pending in the same courthouse as Defendant's case, and that the case concerned business taxes Bertoni was responsible for as head of his law firm. Bertoni told Defendant that the tax case was being handled by U.S. Department of Justice attorneys based in Washington, D.C., not by attorneys from the same office as the Assistant U.S. Attorney handling Defendant's prosecution. He told Defendant he "would not do something in [Defendant's] case to gain favor with the government or judge" in the tax case. Bertoni Dec. ¶ 37. Defendant "indicated he had heard something about [Bertoni's] case and that it was 'okay' with him." *Id.*

Defendant states that while Bertoni was representing him, from August 24, 2017 until sentencing on November 7, 2018, Bertoni visited him a total of six times "in jail." Benitez Dec. ¶ 4. He states, "Collectively we spent no more than five hours discussing my case." *Id.* Defendant states that during three of these visits, Bertoni did not have an interpreter.

In response, the government states that Bertoni met with Defendant "at least 20 times from plea through sentencing." Gov't Resp. 1. This statement is supported by an exhibit attached to Bertoni's declaration, a "record of contacts" that lists Bertoni's meetings with Defendant, including the date and location of each meeting and whether Gonzalez or a court-certified interpreter was there to translate. Bertoni Dec., Attach. 1. The record of contacts supports the government's statement that Bertoni had twenty meetings with Defendant, including four meetings without an interpreter.[2] Four meetings were with a court-certified interpreter in the U.S. Marshal's holding area in the Mark O. Hatfield U.S. Courthouse.

---

[2] An invoice dated June 10, 2018 issued by Bertoni's translator and investigator Eidar Gonzalez, which Defendant has submitted as an exhibit, indicates that Gonzalez and Bertoni met with Defendant at least 12 times between August 23, 2017 and June 10, 2018. Def.'s Ex. 5, 2-3. Because the invoice was issued June 10, 2018, it necessarily does not include Bertoni's additional meetings with Defendant from June 10 to the two sentencing hearings in November 2018.

On October 27, 2017, Bolstad emailed Bertoni "and revived the possibility of an 'early resolution' since Mr. Benitez had previously 'accepted' the offer prior to May 23, 2017." Bertoni Dec. ¶ 22. Bertoni states that he and his interpreter met with Defendant to tell him about the new plea offer and advise him on his options. Bertoni Dec. ¶ 22. Bertoni states, "I believe he understood everything presented to him. After a thorough discussion of the matter, Mr. Benitez indicated he did not want to accept the offer at that time." *Id.*

Bertoni states that from September 2017 to March 2018, he talked to Defendant at each of their meetings about

> how he could reduce his sentence if he actively and truthfully participated in the [safety-valve] process. The "safety valve" was explained to him in detail with the assistance of an interpreter. He was advised over and over again that there are no guarantees but that at a minimum he could receive a 2-level reduction if he successfully proffered and possibly more depending on the value of the proffer and his continued cooperation.

Bertoni Dec. ¶ 23. Bertoni states that he used the sentencing guideline table to show Defendant how offense level reductions could lower his sentence, and gave multiple examples of cases in which safety valve participation significantly reduced the sentence recommendation. Bertoni states that he explained how Boldstad conducted proffers, what to expect, and how to present himself. Bertoni states that Defendant had been initially resistant "to participating in a safety valve proffer or any meeting that appeared like he was cooperating with the government. He eventually warmed to the idea, but even then his attitude was 'lukewarm' at best." Bertoni Dec. ¶ 24.

On March 21, 2018, the day before the scheduled proffer, Bertoni and his interpreter met with Defendant at the U.S. Marshal's holding cell. Bertoni Dec. ¶ 24. Bertoni again reviewed the safety-valve process and the proffer agreement, and tried to ensure Defendant was ready,

emphasizing the need to be "truthful and complete." *Id.* The government comments that Defendant's reluctance to participate in the proffer was "not unusual." Gov't Resp. 9.

On March 22, 2018, the day of the proffer, Bertoni and his interpreter met with Defendant "to remind him what was going to happen and what he needed to do: be truthful, complete, and respectful." Bertoni Dec. ¶ 25. Defendant "was very nervous about his participation in the proffer and concerned that others would learn about his cooperation with the government." *Id.* Bertoni states that he and his interpreter did everything they could to make Defendant "feel more comfortable with the idea of participating in the proffer," including having Bertoni's interpreter there. *Id.*

The proffer was a failure. Defendant "was polite and respectful but minimized his complicity," initially denying being a drug dealer or knowing that the safe was going to be used to store drugs. Bertoni Dec. ¶ 26. The proffer was going so poorly that after about ten minutes, Bertoni took a break to consult with Defendant, away from Bolstad. He told Defendant that "he needed to start telling the truth in order 'to get around' the 10 year mandatory minimum sentence." *Id.* Defendant told Bertoni he understood but when the proffer resumed Defendant continued to minimize his involvement, stating that he learned Lopez-Gonzalez was selling drugs after he asked Lopez-Gonzalez why he was buying a safe. *Id.*

In his declaration, Defendant states that Bertoni and the interpreter met with him and told him that he "had to speak to the government about what I did." Benitez Dec. ¶ 5. Defendant states that he had not spoken about the case with Bertoni and "had not reviewed any discovery" with him. *Id.* Defendant states,

> I did not understand what he wanted me to do. The next day I was transported
> very early to the Courthouse and then to a conference room that I now understand
> is in the prosecutor's office. We reviewed a long legal document that I did not
> really understand. The prosecutor explained it to me and told me I did not have to

> talk to the government. Since I did not understand why I was there or what I was
> supposed to do, I did not want to do the proffer. I told the government nothing of
> substance.

*Id.* Defendant states that Bertoni "never told me why we went there that day. He never

talked to me again about talking to the government." *Id.* at ¶ 6.

Bertoni states that he and his interpreter "debriefed" Defendant immediately after the

proffer. Bertoni Dec. ¶ 27. Bertoni states that he again explained the importance of a safety

valve proffer, how it works, and "how it was the only way, absent substantial assistance which

was never going to happen, for him to get under the statutory mandatory 10-year minimum

sentence." *Id.* According to Bertoni, Defendant indicated he understood what he needed to do,

and authorized Bertoni to set up another proffer. Bertoni states that although Defendant

"recognized the need for a second proffer it was obvious he struggled with the thought of sitting

down with AUSA Boldstad again knowing there was a substantial risk he would, again, be

unable or unwilling to openly talk about his participation in any drug dealing activities." *Id.*

Bertoni concluded that although Defendant understood that a proffer was his only chance to be

sentenced below the statutory minimum, Defendant "could not or would not, for whatever

reason, be completely truthful regarding his involvement in the case" and would fail a second

time. *Id.* Bertoni decided that Defendant had "one last legitimate shot at a proffer" and he did

not "want him to blow it." *Id.* Bertoni focused on negotiating the best possible plea deal, which

he explained would be difficult because Defendant had rejected the previous plea offer, "failed

the proffer and continued to deny all responsibility." *Id.* Bertoni negotiated a plea agreement

that left open the possibility of another proffer to qualify for safety-valve relief. Gov't Resp. 10.

On June 3, 2018, Boldstad sent a plea offer to Bertoni, similar to the April 2017 plea

offer except that it had no reduction for early resolution, and it allowed Defendant to seek a

sentence below the mandatory minimum if he qualified for safety valve relief.  On June 5, 2018,
Bertoni and Gonzalez met with Defendant at the Columbia County Jail to discuss the case and
the plea offer.  Bertoni Dec. ¶ 28.  Bertoni told Defendant "the case was on the threshold of
proceeding to trial and that he needed to decide whether to accept the government's plea offer or
go to trial." *Id.*; ECF No. 113 (minute order setting trial June 19, 2018).  Bertoni states that he
reviewed the sentencing guidelines calculations and showed Defendant how the guidelines table
worked, including the effect of the safety valve provision.  Bertoni noted that Defendant's co-
defendant, Lopez-Gonzalez, had accepted a similar plea agreement on May 30, 2017, and
entered his guilty plea on June 22, 2017.  Bertoni Decl. ¶ 17.  Bertoni showed Defendant the plea
agreement for Lopez-Gonzalez and told Defendant he would not get a lower sentence than
Lopez-Gonzalez if he did not qualify for safety valve relief.  *Id.* at ¶ 28.  According to Bertoni,
Defendant was "adamant" that he did not want to go to trial and authorized Bertoni to accept the
plea offer.  *Id.*

Defendant now states that he "did not fully understand the agreement."  Benitez Dec. ¶ 6.
According to Defendant, Bertoni told him that he had to accept the agreement, and that if he did
not accept it, he "would receive more time in jail." *Id.*  Defendant states that Bertoni told him he
"could expect no more than five years in prison." *Id.*

On June 5, 2018, Bertoni received the government's formal plea agreement letter by
email.  As noted, the June 2018 plea agreement letter was similar to the April 2017 plea
agreement letter except that it omitted the early resolution reduction and allowed Defendant to
request a sentence under the mandatory minimum if he qualified for safety-valve relief.  Plea
Agreement Letter, at 2, ECF No. 120.

### C. Change of Plea Hearing

On June 11, 2018, Defendant pleaded guilty before Judge Marco Hernandez to conspiracy to distribute drugs, as charged in count one of the indictment. ECF No. 116. A court certified interpreter was present to translate the proceedings for Defendant. The transcript of the plea hearing shows that after Defendant was placed under oath, Judge Hernandez carefully reviewed all the terms of the plea agreement with him. Plea Hr'g Tr., Def.'s Ex. 6 (Plea Tr.). Through the interpreter, Defendant stated that he understood the plea agreement and had no questions about it. After Judge Hernandez confirmed that Defendant had no formal education, and could read only "a little bit" in Spanish, he asked Defendant whether he was "able to read the agreement or did somebody need to read it to you?" Plea Tr., at 5. Defendant responded, "Yes, I read it a little bit, and he explained it to me." Plea Tr., at 5. In response to Judge Hernandez's questions, Defendant stated that his lawyer had advised him about the nature and elements of each charge and possible defenses, and that he had a "full and adequate opportunity to tell" his lawyer all facts known to him that relate to the case. Plea Tr., at 5-6. Defendant affirmed that he was "satisfied with the aid and advice" provided by his lawyer. Plea Tr., at 6.

Judge Hernandez then reviewed Defendant's potential sentence. For the government, Bolstad stated that based on a total offense level of 35 and a criminal history category of I, the advisory guideline range would be 168 to 210 months. Plea Tr., at 13. Bertoni stated that "the defense believes there may be a further adjustment. We're continuing with our safety valve consideration." *Id.* Bertoni stated that if Defendant was eligible for safety valve relief, Defendant would ask for a sentence in the range of 57 to 97 months. Plea Tr., at 14. Judge Hernandez then summarized the positions of the government and the defense on the sentencing

guideline range, and asked Defendant if he understood. Defendant responded that he did. Plea

Tr., at 14.

Judge Hernandez emphasized that "ultimately Judge Brown will decide where you are on

the guidelines and what sentence to impose." Plea Tr., at 14. The plea petition similarly stated

that an attorney's calculation of the advisory guideline range "is only a prediction and it is the

judge who makes the final decision as to what [the] guideline range is and what sentence will be

imposed." Plea Pet., at 6-7. Judge Hernandez noted that paragraph 13 of the plea petition was "a

warning to you. And the warning basically is you're going to have to live with whatever

sentence Judge Brown gives you, even if you don't like it." Plea Tr., at 15. Defendant

responded that he understood.

To almost all of Judge Hernandez's questions, Defendant responded that he understood

the proceedings and had no questions about them. At one point in the hearing, however, he

indicated that he did not understand a question. When Judge Hernandez asked whether

Defendant was on probation, parole, or post-prison supervision in another matter, he responded,

"I didn't understand." Plea Tr., at 11. Judge Hernandez then clarified the question, asking, "Do

you have another case where you're on probation or parole or post-prison supervision or

anything like that?" Plea Tr., at 11. Defendant responded, "No, no." Plea Tr., at 11. This

indicates that Defendant was willing to speak up when he did not understand a question.

Near the end of the plea hearing, after the government summarized the facts of the

offense, Defendant pleaded guilty. Judge Hernandez then accepted the guilty plea, stating, "I

find the plea of guilty is made freely and voluntarily, not out of ignorance, fear, inadvertence, or

coercion. I further find that the defendant has admitted facts that prove the necessary elements

of the crime to which he is pleading guilty." Plea Tr., at 21. Defendant's sentencing was set before Judge Brown on November 6, 2018.

After the change of plea hearing, Bertoni arranged for a PSR interview with Ryan Adamson, a probation officer. A PSR interview was set for July 24, 2018, at the Columbia County Jail. On July 17, 2018, Bertoni and his interpreter met with Defendant to review the status of the case and prepare for the PSR interview. Bertoni Dec. ¶ 33. Bertoni explained the PSR interview process and advised Defendant "to be open and honest with Mr. Adamson in regards to his family, educational, employment, and medical history," but not to discuss the criminal charges. *Id.* Bertoni told Defendant that he would be present during the interview and Gonzalez would be there to interpret. *Id.* On July 24, 2018, the day of the interview, Bertoni and Gonzalez met with Defendant before and after the interview to answer questions or address concerns. *Id.*

### D. Sentencing

Bertoni did not meet with Defendant again until November 6, 2018, the day of sentencing. Bertoni states that he had a full work schedule during the 100 or so days between Defendant's PSR interview and sentencing, including a three-day jury trial in Clackamas County that was set for November 6, 2018, although his client there accepted a plea offer the day of trial. Bertoni Dec. ¶ 34.

During this time, Bertoni was suffering from the civil and criminal consequences of his ethical failings. On August 14, 2018, Bertoni received a sentence of 60 months' probation for his criminal tax conviction. On September 13, 2018, the Oregon Supreme Court suspended Bertoni from the practice of law for 18 months, effective November 12, 2018. *In re Bertoni*, 363 Or. 614, 426 P.3d 64 (2018) (suspension based on Bertoni's improper handling of client funds,

failure to adequately communicate, and improper retention of client funds while representing three clients).

Bertoni states that when he met with Defendant on the morning of November 6, 2018, the day of sentencing, he told Defendant, "'we both agree we are not ready to proceed with sentencing today.'" Bertoni Dec. ¶ 34. He also told Defendant, "'If they force you to sentencing you can claim that you have ineffective assistance of counsel' and that [] 'the court may ask you if you want a new lawyer.'" *Id.* Bertoni states that Defendant told him that "he did not want to get a new lawyer and that he wanted me to handle his sentencing." *Id.* Bertoni states that he also told Defendant about his pending 18-month suspension from the Oregon State Bar, which was effective November 12, 2018. Bertoni Dec. ¶ 35. Bertoni states that this was the first opportunity to tell Defendant in person about his suspension from the Bar. Bertoni states that he told Defendant that he could not work on the case after the suspension took effect, so he had "'four days to work on your case to review the reports with you and to write a report for sentencing.'" *Id.* Defendant now states that if Bertoni had notified him sooner about the pending suspension, he "never would have hired him." Benitez Dec. ¶12.

At the sentencing hearing on November 6, 2018, Bertoni requested more time "to meet with Mr. Benitez to make sure that he understands everything." 1st Sent. Hrg. Tr., Def.'s Ex. 11, at 3. Bertoni said he had been busy with other court obligations during the previous two weeks, including the jury trial that had just settled a few hours before. *Id.* Judge Brown granted a one-day extension until the next morning at 10:30 a.m., giving Bertoni time to meet with Defendant before the hearing.

Bertoni filed a six-page sentencing memo on the morning of sentencing. Def.'s Sent. Mem., ECF No. 151 (sealed). In the sentencing memo, Bertoni agreed with the description of

the offense conduct in PSR and the government's sentencing memo, and with the advisory

guideline range of 168-210 months. *Id.* at 2, 3. Bertoni noted that although Defendant was not

eligible for safety valve relief because "the government deemed his interview to be incomplete

and not fully truthful," he had qualified for an interview because he did not have more than one

criminal history point; he did not use or threaten violence; the offense did not result in death or

serious bodily injury; and he was not more culpable than his co-defendant Lopez-Gonzalez. *Id.*

at 3.

Bertoni argued for a downward variance, citing the PSR and presenting a summary of

mitigating evidence regarding Defendant, including his abysmal childhood, history of hard work,

and devotion to his two children. Def.'s Sent. Mem. at 3. Bertoni noted that Defendant "has

suffered from depression for most of his life," had sought treatment in mental health clinics in

the Portland area, and had received treatment for depression at the Columbia County Jail and

Sheridan FCI. *Id.* at 4. Bertoni argued that for a person "who is 41 years old, has lived

conviction free for all of his life, is uneducated, has unresolved medical conditions, and suffers

from depression," the statutory mandatory minimum of 120 months would be reasonable, would

promote respect for the law, punish the offense conduct, and deter Defendant and others from

similar conduct. *Id.* at 4-5.

At the second sentencing hearing, Judge Brown sought "to confirm that since we

convened yesterday, [Bertoni] did have time to meet with Mr. Benitez to your and his

satisfaction." 2d Sent. Hrg. Tr., Def.'s Ex. 12, at 6-7 (Sent. Tr.). Bertoni responded that

he did have sufficient time to meet with Defendant and an interpreter. Bertoni noted that

Defendant "has difficulty, and it is in reading and understanding, and it is important that

there is sufficient time to go over everything so he can comprehend what is happening."

Sent. Tr., at 7. In response to Judge Brown's question, Defendant confirmed that he had

received enough time to prepare for sentencing. *Id.* at 7. As the government states, this

statement "is in direct contrast to defendant's more recent declaration in which he avers

he had no idea what was going on." Gov't Resp. 13, citing Benitez Dec. at ¶¶ 10-11.

Judge Brown noted that Defendant "has had many court appearances. I've tried to make

as clear as I could to him along the way to make the decisions necessary. We've had

many continuances at his request. I don't know if the reason for that was simply he was

unwilling to accept responsibility or his personal issues were getting in the way of

making meaningful decisions." Sent. Tr., at 14.

At the hearing, Bertoni made the same arguments he made in the sentencing

memo. He noted that when Defendant "is properly medicated, he presents well, he's

articulate, he understands. There have been occasions, though, while he was at Columbia

County Jail, where the medication was inappropriate, and you can see the difference."

Sent. Tr., at 8. Bertoni argued that Defendant was at most equal in responsibility to co-

defendant Lopez-Gonzalez, and the government had conceded that no evidence suggested

Defendant had been a leader or manager. Sent. Tr., at 9. He noted that Defendant had

been in Mexico for about a year to receive medical treatment, and returned to Portland

only a month before he and his co-defendants were arrested in February 2017. Bertoni

listed factors that would justify a downward variance, including Defendant's mental

health issues, lack of any criminal history, inability to participate in some prison

programs because he is undocumented, and very difficult childhood.

After affirming to Judge Brown that he had reviewed the PSR with Bertoni,

Defendant apologized to the court for his conduct. Through the interpreter, he stated,

"I'm not trying to justify what I did. I just -- I didn't have a mother nor a father who could give me advice. Life's blows have made me have -- have been making me a better person, and now there's one more blow, which is to lose my children as well." Sent. Tr., at 11. Defendant added, "And on top of all that, I also struggle with a very big depression. My mind has been very bad, and I'd like to apologize." Sent. Tr., at 11-12.

Judge Brown agreed with the recommendations of the government and Probation, and sentenced Defendant to 168 months' imprisonment, the low end of the guideline range. She addressed the 120-month sentence that co-defendant Lopez-Gonzalez received, explaining, "Mr. Lopez-Gonzalez clearly deserved recognition for his immediate acceptance of responsibility," unlike Defendant, who had declined the government's plea offers until just before trial. Sent. Tr., at 14. Judge Brown stated, "I do know the government did incur a great amount of effort under the Court's pressure to be ready for trial on the last date set because there had been so many continuances." Sent. Tr., at 14-15. Judge Brown concluded, "In the end, I'm just not persuaded that any variance from the guideline is warranted here. The guideline acknowledges the significant quantity [of drugs]. . . . . I'm imposing the low end of the guideline range, because I think in the end it's a fair resolution of all the multiple interfacing facts and inferences to be drawn from those." Sent. Tr., at 16.

## II. LEGAL STANDARDS

"A federal prisoner may collaterally attack the legality of his conviction or sentence through a motion to vacate, set aside, or correct his sentence under § 2255." *United States v. Jackson*, 21 F.4th 1205, 1212 (9th Cir. 2022) (citing 28 U.S.C. § 2255(a)). To prevail on a motion under § 2255, a defendant must show that an error of constitutional magnitude occurred

and that the error had a substantial and injurious effect or influence on the guilty plea or the
jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## III. DISCUSSION

### A. Actual Conflict of Interest

Bertoni was a lawyer "with serious professional failings." *United States v. Osemwengie*,
No. 3:11-cr-00060-HZ-6, 2019 WL 1767883, at *1 (D. Or. April 22, 2019) (denying the
defendant's § 2255 motion, which claimed that Bertoni had actual conflicts of interest and gave
ineffective assistance of counsel). Bertoni's financial and ethical problems ultimately caused
him to resign as a member of the bar effective September 2020. Def.'s Ex. 9, at 2 (Or. St. Bar
Bulletin notice of Bertoni's Form B resignation). But the issue here is whether Bertoni's
multiple failings as a lawyer directly affected his representation of Defendant. I conclude that, as
in *Osemwengie*, Bertoni's ethical failings "did not impact the outcome of Defendant's underlying
criminal case." *Id.* I agree with the government that Defendant "was a difficult client who
refused to acknowledge guilt and made poor tactical decisions during plea negotiations even
after being fully advised of his options and the corresponding consequences." Gov't Resp. 16.

### 1. Legal Standards

Defendant contends that Bertoni had an actual conflict of interest that deprived Defendant
of his right to counsel. When a defendant has a Sixth Amendment right to counsel, "'there is a
correlative right to representation that is free from conflicts of interest.'" *Rowland v. Chappell*,
876 F.3d 1174, 1191 (9th Cir. 2017) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). To
prove a Sixth Amendment violation, a defendant must show "an actual conflict that adversely
impacted counsel's performance. This standard means that a petitioner must show more than 'a
mere theoretical division of loyalties,' but must prove 'that a conflict of interest *actually affected*

the adequacy of [counsel's] representation.'" *Pizzuto v. Ramirez*, 783 F.3d 1171, 1178 (9th Cir.

2015) (quoting *Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (emphasis in *Mickens*) (further

citation and quotation marks omitted)). "To show an actual conflict resulting in an adverse

effect," a defendant "must demonstrate 'that some plausible alternative defense strategy or tactic

might have been pursued but was not and that the alternative defense was inherently in conflict

with or not undertaken due to the attorney's other loyalties or interests.'" *Hovey v. Ayers*, 458

F.3d 892, 908 (9th Cir. 2006) (quoting *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005)

(internal quotation marks omitted by *Hovey*)).

### 2. Discussion

Defendant first argues that Bertoni had an actual conflict of interest because he was

"being prosecuted by the same USAO as his client." Def.'s Am. Mot. 23.  That is not correct.

The U.S. Attorney's Office for this district was recused from Bertoni's tax case, which instead

was prosecuted by attorneys with the Tax Division of the U.S. Department of Justice.

Bertoni's tax case was assigned to Judge Michael Simon of this court, while Judge

Brown presided over Defendant's case.  Defendant argues that even though his case was

presided over by a different judge than the judge assigned to Bertoni's tax case, "Bertoni

obviously had an interest in not antagonizing the judges in the courthouse where he would be

sentenced." Def.'s Am. Mot. 24.  Defendant has not shown that this hypothetical conflict

actually affected Bertoni's representation of Defendant. *See Osemwengie*, 2019 WL 1767883, at

*14 (rejecting similar argument regarding Bertoni's representation, finding "no evidence to raise

this allegation from a theoretical conflict to an actual conflict").  I conclude that Defendant has

not shown an actual conflict based on the tax case against Bertoni.

Defendant next argues that Bertoni's "persistent unethical practices surrounding client fees constantly subjected him to new bar discipline." Def.'s Am. Mot. 23. Defendant argues that Bertoni was suspended for "repeated use of improper fee agreements" and "used the exact same improper agreement with" Defendant. Def.'s Am. Mot. 24. Bertoni addresses this argument in his declaration, admitting that while he had used fee agreements in 2011 that violated newly amended Oregon rules, he corrected those violatons before drafting the fee agreement signed by Defendant. Gov't Ex. 1, Bertoni Decl. ¶ 12 n.2. Bertoni states that the "flat fee" agreement signed by Defendant "fully complied" with Oregon rules because it advised Defendant that fees were earned upon receipt; fees would not be deposited in a client trust account; Defendant could discharge Bertoni at any time; and he may be entitled to a refund. *Id.* at ¶ 12. Defendant has not shown evidence that the flat fee agreement in this case was improper, much less that it caused an actual conflict. *See Osemwengie*, 2019 WL 1767883, at *13 ("the modest flat fee in this case, even with the trial escalation and complex case designation clauses, was unlikely to motivate Mr. Bertoni to extend the case through trial preparation.").

Defendant also argues that Bertoni had a conflict because he needed money to pay various debts, such as paying his own criminal defense attorneys and paying the government $181,000 in restitution for the tax case. Def.'s Am. Mot. 27. The Ninth Circuit has noted that "'[l]awyers almost always undertake representation of clients because of their desire to profit from the representation,'" and an attorney accepting a client "'because of a desire to profit does not by itself create [a] direct "actual" conflict of interest.'" *United States v. Walter-Eze*, 869 F.3d 891, 902 (9th Cir. 2017) (quoting *Bonin v. Calderon*, 59 F.3d 815, 826 (9th Cir. 1995)). Here, Defendant has failed to show that Bertoni's financial interest created an actual conflict of interest. Defendant has not shown that Bertoni rejected any plausible alternative defense strategy

because of his "other loyalties or interests." Gov't Resp. 18 (quoting *Wells*, 394 F.3d at 733

(internal citation omitted)). For example, if Bertoni had sought to increase the fees due under the

flat fee agreement, he could have encouraged Defendant to reject the government's plea offers

and go to trial, thereby incurring additional fees. Instead, Bertoni consistently advised Defendant

to accept the plea offers. I conclude that Defendant has not shown that the flat fee agreement

caused an actual conflict of interest.

Defendant also cites state criminal charges against Bertoni, which allege that he had

stolen money from another client. Bertoni was not indicted until after his representation of

Defendant had ended. Def.'s Ex. 2 (state court indictment against Bertoni, filed September 3,

2020). Defendant asserts that this prosecution "was obviously affecting his performance while

representing" Defendant. Def.'s Am. Mot. 25. I agree with the government that this argument

"makes very little sense. There is no stated connection between an alleged theft from a separate

client to Mr. Bertoni's representation of this defendant." Gov't Resp. 19.

Defendant contends that because of Bertoni's impending suspension from the Oregon

State Bar, he rushed or neglected his work on Defendant's case and failed to sufficiently

communicate with Defendant. As the Ninth Circuit has noted, "a lawyer can be disciplined for a

variety of reasons--merely because he is subject to disciplinary proceedings while representing a

client does not mean that he is presumptively incapable of providing effective assistance."

*Young v. Runnels*, 435 F.3d 1038, 1043 (9th Cir. 2006). Defendant's case was not factually or

legally complex, but Defendant was reluctant to accept the harsh reality of his limited options. I

conclude that Defendant has not shown an actual conflict of interest.

### B. Ineffective Assistance of Counsel

Defendant contends that Bertoni provided ineffective assistance of counsel during plea negotiations and sentencing. To prevail on a claim for ineffective assistance of counsel, a defendant must show that the attorney's performance was unreasonable under prevailing professional standards, and that the attorney's deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 694-95 (1984). If the defendant fails to show either incompetent performance or prejudice, the court "must dismiss the claim." *United States v. Sanchez-Cervantes*, 282 F.3d 664, 672 (9th Cir. 2002).

There is a strong presumption that counsel's conduct was reasonable. *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995). "Review of counsel's performance is highly deferential." *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1253 (9th Cir. 1986).

To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter,* 562 U.S. 86, 104 (2011) (quoting *Strickland,* 466 U.S. at 693). Rather, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). Here, Defendant has failed to show deficient performance or prejudice.

#### 1. Plea Negotiations

Defendant contends that Bertoni did not negotiate with the U.S. Attorney's Office and did not prepare Defendant for the safety valve proffer. A defendant has the right to effective assistance of counsel during plea bargaining, including the decision to accept or reject a plea offer. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012).

There is ample evidence that Bertoni negotiated a plea agreement with the government. Before being terminated by Defendant, Matthews negotiated extensively with the government, as shown by emails between Bolstad and Matthews, as well as Matthews's email to Bertoni explaining the status of the case, including plea negotiations. Gov't Ex. 4 (emails exchanged between Bolstad and Matthews); Gov't Ex. 3 (email from Matthews to Bertoni on the status of plea negotiations after Defendant backed out on accepting the first plea offer). Matthews's email to Bertoni indicates that she spent many hours discussing a plea agreement with Defendant, including the difficulty of prevailing at trial and the possibility of losing the 2-level reduction for early acceptance. Gov't Ex. 3, at 1. Given this history of Defendant's long discussions with Matthews about the case, Defendant should have been aware of the stakes involved in deciding on a plea agreement. In her extensive email to Bertoni about the case, Matthews does not state that Defendant had difficulty understanding the issues during her many hours of discussions with him.

Bertoni did negotiate with Bolstad, as shown by an email Bolstad sent to Bertoni in October 2017. In it, the government renews the plea offer that Defendant had accepted and then rejected, asking Bertoni to "give me a call to discuss [Defendant]." Gov't Ex. 4, at 1. Bertoni states that he and an interpreter met with Defendant to discuss the renewed plea offer, but after "a thorough discussion," Defendant "indicated he did not want to accept the offer at that time." Bertoni Dec. ¶ 23. The plea offer Bertoni negotiated and eventually persuaded Defendant to accept did not include the early acceptance reduction but it did allow Defendant to seek a sentence below the 120-month mandatory minimum if he qualified for safety valve relief, an improvement on the earlier offer negotiated by Matthews, which did not allow Defendant to seek a sentence below 120 months.

Despite Bertoni's advice, Defendant turned down multiple opportunities to reduce the potential sentence. I conclude that Defendant has not shown that Bertoni's plea negotiations were incompetent.

Defendant also claims that Bertoni did not prepare him properly for the proffer to qualify for safety valve relief. Defendant states that Bertoni told him that he "had to speak to the government about what I did," presumably referring to the proffer process. Benitez Dec. ¶ 5. Defendant states that during the proffer, Bolstad explained the process and told him he did not have to talk to her. Benitez Dec. ¶ 5. Defendant now states, "Since I did not understand why I was there or what I was supposed to do, I did not want to do the proffer. I told the government nothing of substance." Benitez Dec. ¶ 5. Defendant claims that Bertoni never told him why they talked to the government that day.

Bertoni states that he did explain the proffer process to Defendant multiple times in detail through an interpreter. Bertoni Dec. ¶ 23. Bertoni also states that he met with Defendant the day before the proffer to review the process, emphasizing that Defendant needed to be truthful and complete. Bertoni Dec. ¶ 24. Ten minutes into the proffer, Bertoni asked for a break to advise Defendant away from the prosecutor and agents. Bertoni attempted to salvage the proffer and advised Defendant that he must start telling the truth. Bertoni Dec. ¶ 26. There is no evidence that Bertoni advised Defendant to lie and minimize his involvement during the proffer. That was Defendant's choice, just as he chose to delay accepting a plea agreement until the eve of trial, losing the benefit of early resolution.

Defendant cites *United States v. Boothroyd*, 403 F. Supp. 2d 1011 (D. Or. 2005), in support of his argument that Bertoni did not properly prepare him for the safety-valve proffer. *Boothroyd* is not relevant, however. There, the court found that the defense attorney was

27 -- OPINION AND ORDER

ineffective for failing to investigate and argue for application of the safety valve because the attorney incorrectly assumed that the defendant's possession of a firearm precluded eligibility for the safety valve. *Id.* at 1016-18. Here, Bertoni concluded that Defendant would qualify for safety-valve relief if he could provide a truthful proffer. I conclude that Defendant has not shown that Bertoni's preparation for the proffer was inadequate.

Even if Defendant could show that Bertoni's representation was incompetent during the plea negotiations and the proffer, Defendant cannot show that he was prejudiced. To show prejudice as to the plea negotiations, Defendant must present evidence that "but for counsel's errors, he would either have gone to trial or received a better plea bargain." *United States v. Howard*, 381 F.3d 873, 882 (9th Cir. 2004). Defendant does not claim that he would have gone to trial, which would have exposed him to a potential sentence of 235 to 293 months following the almost certain conviction. Gov't Resp. 24. The evidence against Defendant was overwhelming and not complicated, and the amount of methamphetamine was the largest ever seized in Oregon.

Nor can Defendant show he could have received a better plea bargain with different representation. Defendant rejected the plea agreement negotiated by Matthews. Regardless of his counsel, Defendant's intransigence and distrust of the government would have prevented him from receiving a better plea agreement. For the same reasons, Defendant cannot show he would have successfully completed the proffer had he been prepared and advised differently. Defendant was fearful of the appearance of cooperating with the government if he truthfully answered questions about the offense during a proffer.

### 2. Sentencing

Defendant states in his declaration that at the second day of the sentencing hearing, he was "not sure why" he was taken to the courthouse, although he states that he did talk with Bertoni the day before. Benitez Dec. ¶¶ 10-11. Defendant states, "I still had not seen any sentencing submission and we had no [sic] discussed what if anything I should say to the court." *Id.* at ¶ 11.

As to the 168-month sentence he received, Defendant contends that he did not "fully understand" the plea agreement or Bertoni's advice "except that I could expect no more than five years in prison." Benitez Dec. ¶ 6. At the change of plea hearing, however, Defendant stated under oath that he understood the government would recommend a sentence of 168 months, Bertoni would recommend a sentence of 57 months *if* Defendant was eligible for safety valve relief, and "ultimately Judge Brown will decide where you are on the guidelines and what sentence to impose." Plea Tr., at 14. Defendant's statement that he did not "fully understand" the plea agreement directly contradicts his statements under oath to Judge Hernandez. As noted above, Defendant told Judge Hernandez that he did not understand one of the questions, while affirming under oath that he understood the other questions, which were all designed to determine whether a defendant was pleading guilty knowingly and voluntarily. After carefully examining Defendant and thoroughly reviewing the plea agreement with him, Judge Hernandez found that Defendant pleaded guilty "freely and voluntarily, not out of ignorance, fear, inadvertence, or coercion." Def.'s Ex. 6, at 21.

The defendant's statements under oath at the change of plea hearing, the prosecutor's statements, and the judge's findings in accepting the plea "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). This is

because sworn statements made during the plea colloquy "'carry a strong presumption of truth.'"
*Jackson*, 21 F.4th at 1213 (quoting *Muth v. Fondren*, 676 F.3d 815, 821 (9th Cir. 2012)); *see also*
*United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008) ("Statements made by a defendant
during a guilty plea hearing carry a strong presumption of veracity in subsequent proceedings
attacking the plea."). I conclude that Defendant cannot now contradict his sworn statements
affirming that he understood the potential sentence he could receive.

     Defendant argues that Bertoni was ineffective by failing to obtain medical or educational
records; failing to have a psychologist evaluate Defendant regarding child sex abuse and
depression; failing to obtain documents on Defendant's work history; failing to obtain letters of
support; failing to present mitigation evidence; and filing a late and inadequate sentencing
memo.

     As to educational records, Defendant had no formal schooling, so it is unclear what
relevant records would be available. As to medical records, Bertoni obtained records, apparently
in Spanish, from Matthews, which had been given to her by Defendant's family. Gov't Ex. 3, at
1. After having Gonzalez translate the medical records, Bertoni decided that they "were a mixed
bag, could not be confirmed, presented more questions than answers, and in my estimation were
a potential distraction and overall were not helpful mitigation." Bertoni Dec. ¶ 36. I agree with
the government that Bertoni made a reasonable tactical decision not to present the medical
records. *See Sexton v. Cozner*, 679 F.3d 1150, 1160 (9th Cir. 2012). Defendant has not alleged
that there were any medical reports could have potentially affected the result at sentencing.
Similarly, I agree with the government that a psychological evaluation was not necessary
because the PSR includes information about Defendant's depression, which is not contested, and

because it does not seem particularly relevant to the issues at sentencing. Gov't Resp. 22

("Depression does not excuse or mitigate being a drug trafficker.").

As to employment records, the PSR contains a summary of Defendant's employment

history, which Bertoni also summarized in his sentencing memo. Defendant was unemployed at

the time he committed the offense.

As to letters of support, Bertoni states that he requested letters from Defendant and his

family but did not receive any in response. Bertoni Dec. ¶ 36. The government notes that in the

PSR, Defendant reported that he and Lorena, the mother of his children, "were together for the

sole purpose of raising their children," and that Defendant was in a relationship with another

person. PSR ¶ 57.

As to mitigation, Bertoni did present mitigating information in the sentencing memo,

noting that Defendant

> was left to fend for himself at a young age and was the victim of repeated sex
> abuse. He has no formal schooling and can barely read. He is a hard worker and
> has worked in the fields and forest in Oregon and Washington for over 10 years
> prior to his arrest. He is family oriented and was very involved with his children
> and provided for all their education needs prior to his arrest.

Def.'s Sent. Mem. at 3. Defendant does not cite other mitigating evidence that he argues should

have been presented.

Bertoni did not discuss the sentencing hearing with Defendant until the day set for the

hearing. Nonetheless, by obtaining an extension of time, Bertoni was able to prepare Defendant

for the hearing, file a sentencing memo that covered the relevant issues, and make a presentation

at the hearing, arguing for a sentence at the mandatory minimum.

At the sentencing hearing, Judge Brown asked Defendant, "do you agree you've had

enough time with your lawyer to prepare then for today?" Dec. Ex. 12, at 7. Defendant

31 -- OPINION AND ORDER

responded, "Yes." *Id.* Judge Brown noted that in Defendant's "many court appearances . . . I've tried to make as clear as I could to him along the way the need to make the decisions necessary." Def.'s Ex. 12, at 14. I conclude that Bertoni's representation of Defendant at sentencing was reasonable.

Defendant also cannot show that different counsel could have obtained a better result at sentencing. Again, the problem lies with Defendant, not his attorney. Defendant failed to take advantage of the safety-valve proffer, and has not shown that he would given a truthful proffer with different counsel. A significant factor in Judge Brown's sentencing decision was Defendant's delay in accepting a plea offer, in contrast to co-defendant Lopez-Gonzalez, who received a 120-month sentence. Defendant has not shown that a better presentation of his background would have resulted in a lower sentence. Judge Brown sentenced Defendant to the low end of the applicable guideline range after carefully considering all of the statutory factors under § 3553(a). I agree with the government that Defendant's childhood history "has little bearing on the nature of the offense and the danger it posed to the community." Gov't Resp. 25. I conclude that Defendant has not shown prejudice based on Bertoni's representation at sentencing.

### C. Cumulative Error

Defendant asserts that the cumulative effect of Bertoni's errors violates Defendant's right to counsel and to due process. Def.'s Am. Mot. 35. Because Defendant has not shown that Bertoni's representation of Defendant was either ineffective or prejudiced Defendant, I conclude that the cumulative error doctrine does not apply here. *See United States v. Moalin*, 973 F.3d 977, 1006 (9th Cir. 2020) (citing *United States v. Fernandez*, 388 F3d1199, 1256-57 (9th Cir. 2004)).

## CONCLUSION

Defendant's Motions to Vacate, Set Aside, or Correct his Sentence under 28 U.S.C. § 2255, ECF Nos. 162, 187, are DENIED. The Court declines to issue a certificate of appealability because Defendant has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this 30th day of June, 2022.

Robert E. Jones
United States District Judge